The first case for argument, United States v. Marcus Nelson. Mr. Coroner, I see you were appointed under the Criminal Justice Act, and the court appreciates your services. Thank you, Judge. I appreciate that as well. The police of the court. Counsel. I have to start in a rather uncomfortable position of admitting that this was not the best brief I've ever written in an appeal. I was dealing with an evidentiary issue that I had not really come into contact much in my practice, and that was a failure of disclosure. I've been fortunate in the trials that I've tried to not have this issue come up until this particular case, and I termed something a Brady violation that I think more clearly should have been termed a Rule 16 disclosure violation. The government argued in its response brief that I waived the Rule 16 argument and should be barred from that. I do not believe that that is the case here. I stated all the relevant facts about the particular issue. I put the government on notice enough in my brief that they fully responded to a Rule 16 disclosure issue in their response brief. They cited several cases specifically about Rule 16 and thoroughly briefed the issue on their end. If the court believes that I did waive the Rule 16 disclosure issue, then unfortunately I believe that I would have been ineffective in writing the brief on my client's behalf because that is clearly his best argument that I see on appeal. And in the issue of finality, I ask the court to look at the Rule 16 issue and address it here and now as opposed to possibly having it come back later and have this case continue on. Now that I've... Counsel, I appreciate your candor there. Let's talk for a moment about that Rule 16 failure of disclosure. It's a somewhat unusual situation. It's my understanding that the texts were not introduced into the record, correct? Correct, Your Honor. That is right. The sole use of the contents of the phone was that the witness looked through the phone and sort of read the text into the record. Am I understanding that correctly? Yes, Your Honor. In trial, the counsel for the government approached the witness, handed him an open phone, and asked him to read the text messages. So although the text messages were not introduced in any kind of electronic or printed out format, they were read directly from the phone into evidence by the witness. That's correct. And why didn't, as far as you know, had the witness expressed an inability to remember the text message? No, Your Honor. This was not a situation where he was being asked to refresh his recollection. So I'm thinking about sort of harm...  Absolutely, Your Honor. So in thinking about the harmlessness realm, they could have said, did he text you? What did he say? And if the phone hadn't been involved at all, we wouldn't have a discovery violation? If he had remembered what was on those text messages and any general communications between my client and him, yes, I believe that that certainly could have been asked about and possibly certainly could have come into evidence. I believe that there's differences between general testimony and what happened here in a couple of ways. One, if he had just been simply refreshing his recollection, that's not the way it happened in court. He read directly from the phone, similar to if a police officer had been reading directly from a report. You know, certainly that's not refreshing his recollection. That wouldn't have been done properly. So we know that that's not what was happening here because that's not the way it was handled in court. The next thing, and one of the reasons that I believe that this was so harmful to my client is this was a testimony of a cooperating witness with the government, somebody that did receive a 5K1, and he was certainly the chief witness against my client, a co-conspirator in this particular case. All of his testimony, essentially outside of his cell phone, really had to do with pure credibility issues, in my opinion. And that's where I attacked him on cross-examination, as we do in cases like this with witnesses like him. These text messages allegedly from my client that he was reading directly from his cell phone, now we're talking about words from my client that he's reading, not just that he's trying to remember and that the jury has to take his memory into account for, but the jury believes that as he's looking at this cell phone, that he's reading something that came directly from my client, very similar to some kind of admission or confession from my client. But that could be cross-examined. And I tried, but here's my issue with it, in particular with the phone. It's not just the simple text message that came. Cross-examined in that case might involve getting it into evidence. So I was never given not only that text message, but the string of text messages. Anything else that was on the phone as well. Certainly there could have been impeachment material on the phone. Every other, I've dealt with a lot of cases with electronic information, of course. That's the day and age. This is how these communications happen. And the phones are forensically downloaded. I'm given either printed out copies or some kind of electronic file that I can look at so I can see all the text messages, the numbers that sent them, the times they were sent, what was said in them, not just between my client and the other person, but possibly any relevant things that were on the phone at that time. These are all things that would have absolutely aided in my ability to cross-examine and things that also should have been turned over in discovery to allow for me to have the ability to possibly effectively cross-examine and impeach the witness on this specific issue, not just generally. And I believe that one of the things, as I look through the case law on Rule 16, it came out of a Second Circuit case cited by the government, United States v. Lee, that they talked about in their response brief. Although it's Second Circuit, it's commenting about an advisory committee notes from the 1966 Amendment to Rule 16. And it's specifically looking at factors in determining abusive discretion. The number one factor, the first factor at least, is reason why the disclosure was not made. And a lot of the other cases that the government cited had to do with when a disclosure was made and if there was enough time to cure that disclosure, how long before trial disclosures were made, the volume of discovery, things like that. Here we're dealing with a case where no disclosure was actually ever made. He moved to put it into evidence and talk to a witness about it before ever even showing me the phone, before me having any knowledge whatsoever that the phone had any relevant content on it. And the record shows, and this is actually in the transcripts that I included in the back of my brief, that when the judge kind of inquired to the government why it wasn't turned over, what this was all about, the government said they didn't have to turn it over. It was the government's trial counsel's opinion that Rule 12 and Rule 16 don't make him, don't apply. And I don't understand that. Certainly after all the research that I've done here, but of course he'd have to hand it over. For all the reasons that I just said about cross-examination, my ability to know what's coming, it was a very clear situation of unfair surprise. There's no doubt about that. I've never had an issue like that in court. I've said it. I almost didn't know how to react, because I often deal with the other issue, where I'm getting over-papered. I'm getting too much discovery the week or two before trial, and it always comes with the same issue. They always say, out of an abundance of caution, I wanted to give you this just in case. And that's what I've been used to, and I've been very lucky to be used to that. Here, there's no doubt, it should have been turned over. The whole phone, all the contents on it, if it was going to be used in any way in trial, the defense needed to have an opportunity to look at it, possibly even to have the phone forensically analyzed. Do you think that your best Rule 16 hook is, tell me what you think your best Rule 16 hook is for disclosure. Like looking at the text of the rules. So unfortunately, Your Honor, I have the case law in front of me, not the Rule 16 itself. From the case law, I can say that I know that the first issue is that disclosure needs to be made. Here, there was no disclosure, like I said. And again, this goes kind of both ways on. I believe it is a Rule 16, but when we get into Brady issues and we talk about cross-examination or possible impeachment information, I don't know what else was on that phone to this day. There certainly could have been things on that phone that could have helped me cross-examine him more effectively. I think that that's the most important part of it is, if they were going to enter evidence from this phone, regardless of how they did it, but they used the phone itself, this was not from the memory of the witness, he read directly from the phone, there's no issue with that. So this evidence was from the phone directly. I believe that because it was from the phone itself, that I did deserve disclosure of the contents of the phone. For one, to be prepared for the statement that was made, which did substantially harm my client, because they accounted for the fact that it was from my client, that it was his own words, specifically talking about ordering drugs. Now, of course, as the government pointed out, I downplayed that during closing argument, but I had to at that point. That is my job, is to try to downplay the harshest evidence against me during closing arguments. And I certainly made a run at it, but there's only so much you can do when hit with a bombshell like this and being completely unprepared for it through no fault of the defense, through absolute fault of the government, and we can see that when they said, this didn't need to be turned over. We don't need to make reports about these things. That's what Mr. Sorrell said, on the record, in response to my objection. This also is a situation where there was no disclosure, my client was substantially harmed by this, and then no remedies were really taken. My objection was overruled out of hand, almost immediately, without the court trying to take any other considerations. He overruled the objection. He had already called lunch at that point, so I was given no additional time. We did have a lunch break, but I was given no additional time on top of that. Well, the transcript suggests you were allowed to look at the phone over that lunch break. I was able to hold the phone with the government standing over my shoulder during a short period of time at the beginning of the lunch break. And scroll through the texts? Yes. And it's a flip phone? It was an old flip phone, yes, Your Honor. I certainly was not, although I might have been more comfortable and familiar with those phones 15 years ago, I did feel a little bit like fish out of water trying to navigate that phone at this point. So it was not ideal circumstances to try to be searching for anything that could have helped my client. Especially, like I said, with the government standing over my shoulder, we're not talking about a disclosure here. We're not talking about me being handed printouts or transcripts or something that I can go and away from the government prepare my cross-examination or defense or anything like that with. Certainly, we've seen in a lot of these cases that were cited by the government, we're talking about jail calls or different calls or different things like that. And oftentimes, those calls were either turned over at some point, even if it was at trial. In one particular case, I believe it was United States v. Flores-Morales, in that particular case the government came with recordings the first day of trial. And the government or the court made the government turn those over and have them all transcribed and wanted them all transcribed by the end of the second day of trial. When that was not done, the trial was continued for a full six days to allow those transcripts to be finished and the defense to prepare with those transcripts. The Court of Appeals in this particular case was very straightforward and called it, said the government was remiss in failing to comply with the discovery orders. The Eighth Circuit also called the government's actions a dereliction of duty on the government's behalf. Now, in this particular case, in Flores-Morales... What was that? Is it in your brief? It's in the response brief. It is United States v. Flores-Morales, it's 112 F3rd 337. Now, that case was not overturned because the court found that there was not an abuse of discretion because the government or because the judge took that six-day continuance. He ordered the transcripts turned over. The judge took actions that alleviated the situation and did not call for the evidence to be barred. Well, here the judge gives you the chance to look at it over lunch and you say, thank you, judge. You don't say, I need more, I need a transcript, I need time, can I have a continuance? You just say, thank you, and proceed to, then presumably you look at the phone over lunch and you don't come back at the beginning and say, or do you, and I'm missing it. My feeling was my objection was made and overruled at that point. I was just trying to get back into the situation where I could help my client as much because the, my objection had been ruled on already at that point. So that's where I felt I was at because the objection had been ruled on and lunch had already been taken. I felt like I was being given no additional help by the court here. Was it an appeal 16 objection? It was an objection that I had not seen. It was an unfair surprise objection. It was a, none of this has been turned over. Well, now your argument is I had to see the whole phone in advance. I think that that would have been the proper and appropriate way for things to have happened. Okay, but was that the objection? Is that? My objection was that. You said, why didn't Judge, Judge Menendez asked, why didn't you ask for, you know, call for more than just a laying aloud to look at the text messages the witness was being read? And you said, because my objection had been overruled, it doesn't sound like you had made a, a full phone objection. I need a continuance so I can have a forensic exam and so forth. I certainly let the judge know that nothing on the phone had been turned over to me. I've made the court aware of that situation. That is in the record. I had checked that just before I started arguing today. Judges, I'm going to go ahead and reserve my final 45 seconds for a rebuttal. Thank you. Thank you. Mr. Guster. Thank you, your honors, and may it please the court. Your honors, I, I wanted to just begin from. You handled this at the trial level? No, I did not. Where is he or she? Mr. Sorrell, he's now retired. Keith Sorrell, he was a veteran prosecutor from our office. And let me just say at the outset that that text message, it, it should have been disclosed and I would offer this more as an explanation, not an excuse. But about a week before the trial, the original AUSA who had secured the indictment, he fell ill. And he had, unfortunately, had to be hospitalized. And Mr. Sorrell was the supervisor of the Cape branch at the time. So he took the case over with just days to prepare. So he didn't do the discovery? No. Response? No, he did not. So where's the person that did? Is that person still in the office? He is still in the office. Why, why isn't he arguing? I'm representing the government in, in this particular case and I, I generally handle. It makes it much harder for us to get behind what's going, what went on. Yes. And, and I'm just offering this as a, as a explanation as to what transpired. So Mr. Sorrell then had to prepare for trial in, in just a matter of days. And then to, to compound the problem, originally a deal was going to be struck with another co-conspirator named Matthew Stout. The government learned shortly before trial that Mr. Stout was not going to cooperate. So Mr. Sorrell then scrambled to try to make a, a cooperation agreement with co-conspirator Mr. Wells. What I don't understand, counsel, and I, and I, I, as a former trial attorney, former trial attorney, I get all that. A lot happens and especially with a sick colleague, you know, everyone's scrambling. He wasn't scrambling so much that he didn't find and use this text message to his own benefit. So it feels like there should be, to the extent that we extend compassion and understanding, the request is almost that it go only, only as far as the government. If he had time to find this text message, why didn't he disclose it? Yes, and, and our normal practice, the normal office practice would certainly be to, to disclose that. And, and the AUSA who tried the case, I can tell you it was his normal practice to do that. Unfortunately, it was not done in this particular. Was the normal practice disclosed to the trial court when the objection was made? No, no. And I, I've read the, the transcript and I, I, I believe that's an inaccurate statement of rules 12 and 16. He, he defended it on the ground that it wasn't taken from the defendant so he didn't have to turn it over. Right. Which is not true. That, that was an inaccurate statement of the, of the law. But along the lines of something you had mentioned, Judge Menendez, when you read the transcript, so we're talking about a, a single text message that said, he's sending 30. And, and one of the points that you, you made, Judge Menendez, was that there's this lunch break for at least 45 minutes. Mr. Korner makes an objection. Now, the judge overruled it, but he instructs the prosecutor to specifically show Mr. Korner over the lunch break what he plans to get into. And as I said, it's just a, a single text message that said, he's sending 30. Well, there's a little more conversation about Mikey, who's Mikey in the text messages. Right. These are all on that phone, right? We haven't slipped to other text messages. Right. So it's more than just, he's sending 30. It's how do we know who the he is? How do we know what the 30 is? 30 light, not 30. Right. And, and he's, he's explaining what that means. But when, when the trial resumes, there's no further objection, and I'm not saying that he had to object again to preserve it, but when you, when you read the transcript in, in the context of the entire proceeding, they resume and there's no further objection made. At the close of the government's case, there was a motion for acquittal. The text message was never mentioned in that motion. There was another motion for judgment of acquittal at the close of all the evidence. The text message wasn't mentioned there. Are you suggesting an evidentiary issue should be part of a motion for acquittal? No, but he, he could have. Why would you disclose something that was adverse? In the motion for judgment of acquittal, he could have brought that up again. That's simply what I'm saying. Why? Why would you? You can't get an evidentiary ruling in, in making a judgment of acquittal motion. That's a, that's a, I'm sorry, that's a silly argument. And there was no, additionally, there was no motion for, for new trial filed as, as well. What case says that was required for this issue? It was not required. I'm just, in the context, when you, my point is that when you view the. What, what weight do we give that? Well, when you view the evidence. And what authority? When you view the evidence in its entirety, like I said, we're just talking about a single text message. He's sending 30. Another point. We're also talking about a plan by the rules. And I keep hearing more and more rules ignored or winked at. Well, and your honor, I think we, we do need to keep this in the context of, of the entire trial as a whole and the evidence as a whole. You know, some of the cases talk about with rule 16 violations, the defendant has to show substantial prejudice. Not just prejudice, substantial prejudice. And I think one of the key things to keep in mind in this inquiry is, did, did it impact the overall trial strategy as a whole? And in this particular case, I don't believe it did. It's important to note too, the only evidence that this text message even came from Mr.  You had to believe Mr. Wells that the text message came from him. He had it under some nickname in his phone. There was no other law enforcement testimony linking Mr. Nelson to that particular phone number. So this was just part of, of Mr. Wells' testimony. Also, when viewed in context of the, the entire trial as a whole, we're forgetting too, that look at the December 10th traffic stop. It's not even referenced in, in Mr. Nelson's brief. That was an incident where Mr. Nelson was pulled over. He tried to flee from the police. He was apprehended a short time later. They found over eight ounces of methamphetamine in the vehicle, along with a stolen pistol. And when he was arrested, he was making jail calls that were recorded. They were played for the jury, where he's trying to get other people to take the charges for him. And that was a, an SUV that was registered. How much did the he's sending 30 quantity affect the sentence? I don't know how much it affected the sentence. Mr. Nelson was a career offender. You've got a 300 month sentence. So I assume, I assume a lot of it was drug quantity. Well, he was, he was independently a career offender as well. So his, his guideline range was going to be 360. You don't know, you have no idea in terms of harmless error, what impact this, this evidence had on the sentence. The guideline range would have been exactly the same by his status as a, as a career offender. He was subject to the chapter four enhancement. Sometimes quantity increases the range over the career offender range. It can, but in this particular case, either way, his guideline range was going to be 360 to life. Did the he's sending 30 influence the mandatory minima? No, no. That, that did not impact the mandatory minimum. Or the stat max that then affects the career? Right. So on the March 19th incident, when he was arrested, the police recovered over 11 pounds of methamphetamine in that particular incident. And then in the December incident, they recovered over eight ounces, which is I think nearly 300 grams. So that, that did not impact the, the mandatory minimum. Can I ask you another couple questions about this, this exact set of texts? You know that sometimes a phone is just a phone, and other times a phone is the contents of the phone. And they serve two different evidentiary values. And usually, if you're using the contents of the phone, it's been forensically downloaded in some way, or someone has prepared a document or a transcript or an audio recording of what you're pulling from the phone, as opposed to the phone being evidence itself, right? Was there a forensic download, a transcript, or anything else ever prepared? There was not in this, in this case. And I've asked the law enforcement officers, and they said they just never, never sought to do that in this particular case. So at some point, they just decided to look on this phone and see if it had anything good for the government? I believe, so, the background of this is, is Mr. Sorrell was attempting to, to prepare for trial. He arranged a proffer meeting with Mr. Wells. And during the interview, I believe this happened the weekend before trial, trial started on a Monday, among other things, when he was talking about his methamphetamine trafficking activities, the, the subject of a, of a possible text message communication was, was broached. And that, they found out that that phone was still in evidence. And so, the, Mr. Wells had, had told Mr. Sorrell about the, the text message. And then, was a 302, or whatever your version of that is, prepared of that conversation that said that Mr. Wells has referred to text messages? Was a statement, a Jancks Act statement turned over, or anything from the proffer? No, there was no, there was no statement. And, and, as I said, I mean, the, the, the, Mr. Corder should have been disclosed, that should have been disclosed immediately. Unfortunately, it, it, it was not. So I'm, not just through the phone, but, he had no way of knowing, counsel had no way of knowing until the moment this is offered in court, that this existed, that contents of the phone existed, that it was going to be used, neither through Jancks Act material of the proffer prep, or through a forensic download, or through a heads up. He had no way of knowing until that moment. The contents, you're, you're correct. That the contents are evidentiary. The existence of the phone. Right, right. We all know, but that's far less. Yeah, the phone was on the exhibit list, but it, you're right, the, the contents were not, were not disclosed. But, even assuming, so the district courts have, have just broad discretion, though. Assuming we even, we even address the, the Rule 16 violation, as I point out in the brief, it's the well-accepted practice of this court that arguments not presented are, are deemed plain. It just feels a little disingenuous for the government, disingenuous is the wrong word, I apologize. It feels a little unfair for the government to invoke a rule of strict interpretation against a defendant to defend its own violation of a really key kind of due process protecting rule. And, and that's why I'm addressing the, the, the Rule 16 violation. If the court, if the court has discretion, you, you. When was the exhibit list disclosed? I believe the exhibit list was emailed by Mr. Sorrell to, to Mr. Korner the Friday before trial. Before this interview? Yes. Like I said, these were not ideal circumstances, he, he was scrambling to try to. And when would, when did the government acquire the phone? Well, the phone had actually been seized back on March 19th, 2019, when both Mr. Wells and Mr. Nelson were arrested. So. Is that when they both fled? No. No. No. So, Mr. Nelson was arrested on December 10th and Mr. Wells was not with him on that incident. But then Mr. Nelson posted bond and he was, he was back, back out. But discussing a potential Rule 16 violation, again, going back, district courts have broad, broad discretion. What was the phone in Wells' possession when it was seized at the joint arrest? When he was arrested? Yes. Well, when the government got it, was, was, was the phone, was, was the phone in a place where the defendant would have known about it? No, and known the government had it. Yeah. When Mr. Wells was arrested, that's when, when his phone was collected in March. Does the record show whether the phone was whose possession it was in or where it was? After it was collected? When it was seized? No, not after it was collected, when it was seized. Yeah, I believe it was in Mr. Wells' possession. Was it in the glove compartment? Pardon? Oh, no. Mr. Wells was arrested at his home on March 19th. So we have a traffic stop on December 10th. And the defendant was not there, he was arrested somewhere else? I'm sorry, I don't, I don't know. So the, the facts of the case, there are two separate arrests. I'm looking for what, whether, whether the defense should have been alerted to the need to ask for this phone, even if it wasn't disclosed. And so I'm trying to get at when it was seized and how and what circumstances. It was seized by law enforcement officials. Okay. But it had messages between the defendant and Wells, according to the. That were not disclosed, that were not discovered until shortly before trial. Yes, but if, if, if they existed and the defendant sent them, he knew about them. Yeah, the defendant. All right. So he sent them to a phone. And if he sent them to Wells's phone and he knew that the law enforcement had seized that phone, then that makes it a different sort of level of ignorance. Well, and that's why. I'm trying to get an answer. It sounds like they're abandoning the, the Brady material. I'm asking questions. Where was the phone when it was seized and who was there? Mr. Wells was present. Mr. Nelson, they were both arrested on the same night. Were they both in the same place? Mr. Nelson was upstairs and Mr. Wells was in the driveway of his home. What happened? Law enforcement officers did a knock and talk at the home of Gina Wells. Gina Wells went outside to speak with the law enforcement officers. While they were speaking with Mr. Wells, they heard a loud thud on the side of the house. They went around to the side of the house. Yes, there was a 11 pounds of methamphetamine had been thrown out of the window. And at trial, Gina Wells' son. Where was the phone at that moment when the thud? It was in Mr. Wells' possession. I don't recall if it was in the house or if it was in his pocket, but it was recovered that evening. And then Mr. Wells' son testified that he, first hand observation, he saw Mr. Nelson frantically run around, pick up the bag and throw it out of the window. And the jury believed that testimony and credibility determinations are of course uniquely within the province of the jury. Thank you. Thank you. Mr. Corner for rebuttal. Yes, thank you. This is something that I stayed away from because it wasn't in the record. There was a point when I came across a report from law enforcement in my investigation of the case that said about the phones, specifically all the phones overseas, that there was nothing of evidentiary value. So yes, this was more surprising to me when this came out. Did you make a discovery motion that invoked the protections of rules 12 and 16? Specifically, no, Your Honor. Early in the case, you didn't do a form motion or give me the things I get under the rule? I don't remember at this point, Your Honor. Do you usually? I apologize. Generally, yes, but I know there are cases where I have not. So I can't say with any credibility. I will say no memorandum of interview, which you know Wells was handed over to me, as is done in most proffers. I was not given that. So I was completely caught off guard by this. There was no way that I could have known. Thank you. Thank you, counsel. The case has been well briefed and the argument has been helpful, at least for me, on the devilish details. We'll take it under advisement. All right.